UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Lisa D. Miller, | ) | Civil Action No.  5:12-2693-MGL-KDW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin,[1] Acting | ) | OF MAGISTRATE JUDGE |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.).  Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act").  For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative proceedings.

I.      Relevant Background

A.      Procedural History

On August 6, 2010 Plaintiff protectively filed for DIB under Title II of the Act, 42 U.S.C. §§ 401-433, alleging she became disabled on July 16, 2010. Tr. 110-11.  After being denied initially and at the reconsideration level, Tr. 81-95, 98-105, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 106-08. The ALJ conducted a hearing on October 20, 2011, taking testimony from Plaintiff and Vocational Expert ("VE") Mark Leaptrot. Tr. 53-88.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Carolyn W. Colvin for Michael J. Astrue as Defendant in this action.

Representing Plaintiff at that hearing was her attorney, Kevin Kline.[2] The ALJ denied Plaintiff's claim in a decision dated January 5, 2012. Tr. 13-19. Plaintiff requested review of this decision from the Appeals Council, Tr. 7-9, which denied her request on August 27, 2012, Tr. 3-6, making the ALJ's decision final for purposes of judicial review. *See* 20 C.F.R. §§ 404.981 and 422.210(a). Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on September 18, 2012.  ECF No. 1.

  B.  Plaintiff's Background

  Born April 3, 1979, Plaintiff was 31 years old as of her alleged onset date of July 16, 2010, and 32 years old as of the date of the hearing and the ALJ's decision. *See* Tr. 18, 56. Plaintiff has past relevant work ("PRW") as a rural mail carrier for the United States Postal Service ("USPS") and as a cashier and machine worker. *See* Tr. 59, 84, 143. Plaintiff alleges she became disabled on July 16, 2010, when she was hospitalized with complaints of lower abdominal pain, back pain, right-sided flank pain, and vomiting. Tr. 207. Plaintiff explained at the hearing that she left her mail route on July 16, 2010 because she was "hurting real bad" in her back and "throwing up." Tr. 59. In the DIB application under review, Plaintiff indicated the following conditions limited her from working: "Lupus;[3] Blood clot that killed part of kidney; [and] high blood pressure." Tr. 134. Plaintiff also indicated she was on blood thinner, which made her bleed more if she got cut. *Id.*

---

[2] Mr. Kline withdrew as Plaintiff's attorney representative. Tr. 2. Hal Wood Roach represents Plaintiff in this appeal.

[3] Lupus is "a chronic inflammatory disease that can affect an organ or body system." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 14.00(D)(1).

C.    Administrative Proceedings

1.    Plaintiff's Testimony

At the October 20, 2011 hearing, Plaintiff testified she was then 32 years old, five-and-one-half feet tall, weighed approximately 190 pounds, and was right-hand dominant. Tr. 56. Plaintiff said she was married and has two teenaged children and lives in a mobile home with her husband and children. Tr. 56-57. Plaintiff indicated that her husband and her mother supported her household. Tr. 57. She receives no food stamps, has never received workers' compensation benefits, and has not drawn unemployment benefits since 2002. Tr. 57-58. Plaintiff completed the tenth grade of high school and has now earned her GED. She has no college or vocational training. Tr. 58.

Plaintiff was last employed by the USPS as a rural mail carrier. Tr. 58-59. Her last day working with the USPS was July 16, 2010, when she was hospitalized because she was "hurting real bad in [her] back and throwing up[.]" Tr. 59. Plaintiff said she left her delivery route and went back to the post office, where her mother-in-law picked her up and transported her to the hospital. *Id.* Plaintiff explained that "they [medical providers] said [she] had a blood clot that went to [her] kidney and killed two-thirds of it." *Id.* Plaintiff was hospitalized for one week and then began recovering at home, where she was to give herself shots of Lovenox, a blood thinner. *Id.* Plaintiff developed a hematoma from giving herself the blood-thinner shots; the hematoma was drained and took about a week to heal. Tr. 60.

Plaintiff said she was not released to return to work after that because her lupus had gotten progressively worse over the past several years and the medication she took for lupus was not helping like it had before. Tr. 61. Plaintiff explained that lupus caused her joints to hurt "real bad," especially her feet and hands. *Id.* She testified that she would get "real bad joint pain and

3

knots on the bottom of [her] feet." *Id.* Plaintiff said her foot pain caused her to "walk funny," which she thought made her hip joints hurt. *Id.*

Plaintiff indicated that Dr. [Rebecca W.] Norris, her family doctor, told her she would be unable to return to work because of her lupus ("joints hurting and real bad swelling"), blood pressure problems, and because she is on blood thinner. Tr. 61.

When asked to describe her activities in a "typical day," Plaintiff said she "sits a good bit" in a recliner to reduce the swelling in her legs. Tr. 62.  She said she would get out of the chair and moves around after she experiences pain from sitting. *Id.* Plaintiff said that when she had pain in her joints, legs, and hips from moving around she would sit back down to recline and relieve the swelling. *Id.* Plaintiff said she was "pretty much back and forth" trying to alleviate pain. *Id.*

Plaintiff testified that she spent a few hours a day reading or watching television. Tr. 62-63. Plaintiff said she cooked some, but her children helped with the cooking. Tr. 63. Her children also helped her with laundry, dishes, vacuuming, and other household chores. *Id.* Plaintiff said she tried to sweep some, but would have to take breaks. *Id.* Plaintiff goes to the grocery store with her mother's help, visits with family members, and attends church about once per month, depending on how she is feeling. *Id.* She does not garden or have any hobbies. Tr. 64-65. She drives to pick up her children from school two-to-three times per week. Tr. 65, 73. Plaintiff testified she was no longer able to go walking with her aunt and that she tried to avoid being outside because of the side effects of prednisone. Tr. 65, 70. Plaintiff said she smoked about half-a-pack of cigarettes per day, she drinks no alcohol, and uses no drugs. Tr. 65-66.

Plaintiff described the work she did with USPS, explaining that she would first go to the post office, where she would gather up the mail she was to deliver and that the mail would be in

tubs or trays that weighed between 10 and 20 pounds. Tr. 66. Sorting the mail would take her approximately four hours. Tr. 67. Delivering the mail would typically then take her between three and four hours to complete. Tr. 67-68. Plaintiff said she mainly sat in the truck to deliver the mail, but would get out to deliver packages and certified mail. Tr. 68.

When asked what prevented her from returning to her mail-carrier job, Plaintiff said the lifting, getting in and out of the car, and the riding in the car caused her legs to swell "really bad," and that the stress caused her lupus to "act up more," which then made her joints hurt more. *Id.* When asked what would keep her from working in an office where she would mainly sit down but could get up as needed, Plaintiff said her everyday joint pain and achiness, which she described as being flu-like, would prevent her from doing that sort of office job. Tr. 68.

Plaintiff testified that she has more bad days than good days. Tr. 69. She described a bad day as one in which she tried to stay comfortable by moving between chairs, recliners, the couch, and walking. *Id.* She described a good day as one in which her aches and pains are not as bad and she is able to sit comfortably for a bit longer. *Id.*

In response to further questions about her pain, Plaintiff said she had pain and achiness in her joints—mainly hands, feet, and hips—but that she sometimes had pain in her knees, ankles, and elbows. Tr. 69. Plaintiff said she had arthritis along with lupus. *Id.* Plaintiff said she had been taking blood thinner to help with swelling, but she had to quit taking it because of the strain on her kidneys. Tr. 69-70. Plaintiff said she took prednisone for lupus, but it required her to stay out of the sun and it affects one's kidneys and liver. Tr. 70. Plaintiff said that, although one is not supposed to remain on prednisone for a prolonged period, she had been taking it since she was 19 years old. *Id.* She said she used to take methylprednisolone, but pharmacies could no longer get that medication. She indicated the prednisone was not as helpful for her pain. When she went

without her medication for a few days, she experienced "the worst pain that you will ever feel." *Id.*

Plaintiff said prednisone and warfarin (blood thinner) caused increased bleeding, bruising, and skin tearing. Tr. 71. She also said she had continuing problems regulating her blood pressure. *Id.*

Plaintiff estimates she can sit comfortably for about 30 minutes at a time, can stand for about 30 minutes to an hour, and can walk for about 30-45 minutes at a time. Tr. 72. She said she can lift or pick up things that weigh about 10 pounds, but her hands begin shaking at around 10 pounds. *Id.* Plaintiff also explains that when she props her legs, she is supposed to try to prop them with her legs above her waist and that she does this for about three-to-four hours per day. *Id.* She said that, when lifting things, Plaintiff would have difficulty gripping objects and would have difficulty picking up anything she dropped, although she would be able to pick it up. Tr. 71-72. Plaintiff said she tried to avoid stair-climbing because of pain in her knees and feet. Tr. 73.

Plaintiff testified that she was not able to concentrate and loses focus when reading. Tr. 73-74. Plaintiff said she did not think she would be able to perform repeatedly a simple task for two hours. Tr. 74. She attributes this to her pain as opposed to psychological problems. *Id.* Plaintiff said she had swelling and pain in her hands about every other day and that they swell more with increased activity. Tr. 75.

Plaintiff indicated that, with the help of her daughter, she cooked about two-to-three times per week, but had to take frequent breaks when doing so. Tr. 75-76. Plaintiff said that, when she did household chores, she could do them for 10-to-15 minutes before needing to take a 30-minute break. Tr. 76.

Plaintiff said she had between 20 and 25 bad days per month. Tr. 77. She said hypertension caused her dizziness and lupus caused her face to break out in rashes. Tr. 78-79. She said she was tender "[j]ust about everywhere and experienced fatigue. Tr. 79.

Plaintiff said her kidney damage caused her to need to go to the bathroom about every 10 minutes. Tr. 80. She said she had difficulty sleeping at night and sleeps about five or six hours each night, which leaves her tired the following day. *Id.*

She said that she would not be able to do household chores on her own. Tr. 80.

2.     VE Testimony

VE Leaptrot testified that Plaintiff's PRW was as a rural mail carrier (medium exertion, semi-skilled, SVP: 4) and as a cashier (light, unskilled, SVP: 2). Tr. 84. The ALJ described a hypothetical 32-year-old worker who has a GED with the same PRW as Plaintiff and who can do light work with the following limitations:

> With the joint pain and all she probably would need to change positions, I don't know that she could stand to or simple work or how many hours but ability to – a job that by its nature would let you sit or stand kind of as you needed to. I'm going to put never a ladder. They've got frequent on the other posturals and I'll agree with that that she couldn't do the repetitive full-time. [] She can climb maybe a flight of stairs occasionally but she couldn't climb them all the time, balancing, stooping, all of those are probably frequent but not, you know, not repetitive. [] I am going to add avoid concentrated exposure to cold, heat, humidity, hazards. I'm going to put moderate exposure to hazards because of the Coumadin. [] any outside work in the sun would be avoided.

Tr. 85. The VE opined that such an individual could not return to her PRW because of the need to change positions. Tr. 86. The ALJ then added to the hypothetical that the individual would be required to perform only unskilled work. *Id.* The VE opined there would be jobs available that such an individual could perform: mail clerk in an office situation (light, unskilled, SVP: 2, 1500 in the region (state of South Carolina) and at least 137,000 in the U.S. economy); and routing

clerk (light, unskilled, SVP: 2, 9900 in the region and at least 660,000 in the U.S. economy). Tr. 86. The VE testified that these jobs were consistent with the DOT (Dictionary of Occupational Titles). *Id.*

Plaintiff's counsel amended the hypothetical question to include the following:

the hypothetical individual would need to elevate their legs above the waist at least we'll say three hours of an eight hour day. Assuming the hypothetical individual[,] due to chronic pain would need unscheduled work breaks every one to two hours for approximately 30 minutes; is limited to lifting occasionally 10 pounds; must avoid all exposure to heat, dust, fumes, gasses, humidity; is incapable of even low stress jobs.

Tr. 87. The VE opined that such an individual would not able to perform gainful employment because such employment does not permit one to "elevate their feet above the waist level," and the breaks would be excessive. *Id.*

II.     Discussion

A.      The ALJ's Findings

In her January 5, 2012 decision, the ALJ made the following findings of fact and conclusions of law:

(1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

(2)     The claimant has not engaged in substantial gainful activity since July 16, 2010, the alleged onset date (20 CFR 404.1571 *et seq*.).

(3)     The claimant has the following severe impairment: systemic lupus erythematosus (20 CFR 404.1520(c)).

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

8

(5)    After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity (RFC) to perform light work, as defined in 20 CFR 404.1567(b), except that she is to have the option to alternate at will between sitting and standing; she is to avoid more than frequent balancing, stooping, kneeling, crouching, crawling, or climbing of stairs or ramps; she is to avoid all climbing of ropes, ladders, or scaffolds; she is to avoid concentrated exposure to extremes of temperature or humidity; she is to avoid even moderate exposure to unprotected hazards; and she is to avoid all outside work in the sunlight.

(6)    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

(7)    The claimant was born on April 3, 1979 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

(8)    The claimant has at least a limited education and is able to communicate in English (20 CFR 404.1564).

(9)    The claimant has no transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 404.1569 and 404.1569(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from July 16, 2010, through the date of this decision (20 CFR. 404.1520(g)).

Tr. 15-19.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

11

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

Plaintiff claims the ALJ erred in the following ways: (1) by failing to give controlling weight to the opinions of Plaintiff's treating physicians, rheumatologist Amir Agha, M.D. and family care physician Dr. Norris; (2) by failing to find Plaintiff was disabled under Listing 14.02, Systemic lupus erythematosus ("SLE" or "lupus"); (3) by mischaracterizing the record; and (4) by failing to make adequate findings regarding Plaintiff's credibility. *See* Pl. Br., ECF No. 19; Pl. Reply, ECF No. 22. The Commissioner submits that the ALJ committed no reversible error and her decision is supported by substantial evidence. *See* Def. Br., ECF No. 21.

        1.       Treating Physicians' Opinions

        a.      General Medical Background

Plaintiff left work and went to the emergency department of Anmed Health Hospital on July 16, 2010 (her alleged onset-of-disability date), with complaints of lower abdominal pain, back pain, right-sided flank pain, and vomiting. Tr. 207, Tr. 262. Her initial "problem list" included the following: blood clot in right kidney ("Large right kidney infarct"); lupus;[5] severe pain; and hypertension. Tr. 263. While hospitalized, Plaintiff was evaluated by Dr. Agha. Tr. 267-68. Dr. Agha noted Plaintiff presented with polyarthralgia, malar rash, myalgias, and leucopenia. Tr. 267. Lab work indicated abnormal serologies and her musculoskeletal symptoms were secondary to SLE. Dr. Agha put Plaintiff on methyl prednisolone. *Id.* Plaintiff told Dr. Agha she had had taken Plaquenil for seven years but it was discontinued at least five years ago for an unknown reason. *Id.* Plaintiff told Dr. Agha her lupus had been "relatively quiescent" for some time, although she had flare-ups of joint pain, myalgia, fatigue, with intermittent rash, some photosensitivity, occasional oral ulcers, Raynaud's phenomenon, pleural pericardial disease, kidney and liver problems. *Id.* Dr. Agha's impressions noted history of chronic lupus, current renal infarct, and a "question of phospholipid antibody syndrome." Tr. 268. He planned to review records of Dr. Lawson, ordered testing, and noted Plaintiff needed anticoagulation and

---

[5] Plaintiff was diagnosed with lupus at age 19. *See* Tr. 70. Prior to her July 2010 hospitalization, Dr. Jeffrey G. Lawson at Piedmont Arthritis Clinic had treated Plaintiff's lupus. *See generally* Tr. 191-206 (records from February 2009 through February 2010). Plaintiff also saw Dr. Lawson on August 19, 2010, subsequent to her July 2010 hospitalization. Tr. 296-97. Dr. Lawson noted Plaintiff presented with joint pain, joint swelling, weakness, and fatigue in multiple joints, both knees and both ankles. Tr. 296. Notes indicated Plaintiff's pain would "come and go," and was "moderate to severe." *Id.* The pain was worse when standing, walking, or with physical activity, and was better with medication and rest. *Id.* On examination, Dr. Lawson found Plaintiff's musculoskeletal system to be normal and that she had a normal range of motion in her spine. *Id.*

possible disease modifying agent as well as prednisone. *Id.* Plaintiff was to follow up with Dr. Agha as an outpatient. Tr. 264.

Plaintiff was discharged on July 23, 2010, with diagnoses of right-sided flank pain secondary to right kidney acute infarct, pain controlled; uncontrolled hypertension; SLE; marked proteinuria, "most probably secondary to acute kidney infarct," for which she was to follow up with nephrology; and advised to discontinue birth control pills and smoking and to lose weight. Tr. 264. Discharge notes indicated Plaintiff had been evaluated by Dr. Agha of rheumatology, who was considering putting her on disease-modifying agents in addition to prednisone. *Id.* Plaintiff was given instructions to take two different blood thinners; specifically, she would taper off giving herself Lovenox blood thinner shots and continue taking a Coumadin/Warfarin pill once her blood levels were in the right range. Tr. 264-65. Three days after being discharged, Plaintiff returned to the hospital with a large bruise on her left side from improperly administering a Lovenox shot. Tr. 60, 209, 214. This was drained and she was discharged home the same day with direction to stop using Lovenox shots. Tr. 215, 298.

b.      Opinions of Treating Physicians

i.      Rheumatologist Dr. Agha

Dr. Agha provided an opinion dated December 8, 2010. Tr. 358-65. Dr. Agha opined Plaintiff fulfilled the diagnostic criteria for SLE. Tr. 358. Dr. Agha indicated Plaintiff identified the following as objective signs of Plaintiff's lupus: malar rash; discoid rash; photosensitivity; non-erosive arthritis involving pain/tenderness in joints, including wrist and knees;[6] renal involvement; "anti-DNA and anti Sm antibody;" a positive test for ANA; and symptoms

---

Dr. Lawson noted Dr. Agha planned to restart Plaintiff on taking hydroxychloroquine (Plaquenil). *Id.*

including severe fatigue, severe malaise, and hair loss. Tr. 359-60. Dr. Agha stated Plaintiff was not a malingerer and opined that emotional factors "may" contribute to the severity of Plaintiff's functional limitations. Tr. 360. Dr. Agha opined that Plaintiff's lupus symptoms would "Often" or "Frequently" be severe enough to interfere with attention and concentration and that she was incapable of even "low stress" jobs. Tr. 360-61. Dr. Agha rated Plaintiff's prognosis as "fair," and noted her symptoms had lasted or were expected to last more than 12 months. Tr. 361. Dr. Agha opined Plaintiff could walk one-to-two blocks; sit 10-to-15 minutes; stand five-to-ten minutes; and could stand and walk a total of fewer than two hours in an eight-hour day. Tr. 362. Dr. Agha opined Plaintiff would need a job that would allow shifting at will from sitting to standing to walking and would need to take unscheduled breaks of approximately 30 minutes every one-to-two hours. Tr. 362. Dr. Agha restricted Plaintiff from almost all environmental features except perfumes. Tr. 364. Dr. Agha found Plaintiff would suffer from good days and bad days and miss more than three days of work per month. Tr. 365.

ii.     Primary Care Physician Dr. Norris

Dr. Norris, Plaintiff's treating physician, completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on November 19, 2010. Tr. 355-57. Dr. Norris opined Plaintiff could occasionally lift and carry up to 10 pounds and could never lift or carry more than 10 pounds. Tr. 355.  Dr. Norris found Plaintiff would be limited to sitting, standing, and walking one hour per day because of hip pain. *Id.* Dr. Norris further indicated that Plaintiff should have her legs elevated above her heart six hours out of an eight-hour work day because she got dependent edema.[7] Tr. 356. Dr. Norris indicated Plaintiff could occasionally reach

---

[6] Portions of Dr. Agha's notes listing other affected joints are not legible. Tr. 358.
[7] "Dependent edema" is a "clinically detectable increase in extracellular fluid volume localized

15

overhead, but should do no other reaching; could feel frequently and handle and finger occasionally; could occasionally climb stairs/ramps, stoop, and crouch; could never climb ladders/scaffolds, balance, kneel, crawl, or push/pull. Tr. 356-57. Rather than complete the portion of the Medical Source Statement asking her to identify particular medical or clinical findings that supported her assessment as to limitations on Plaintiff's use of her hands, Dr. Norris wrote, "see copy of chart." Tr. 356. In explaining the limitations she placed on Plaintiff's postural activities, Dr. Norris noted that Plaintiff suffered from skin tears because she took Coumadin and that she had balance problems. Tr. 357. Dr. Norris opined Plaintiff would be absent from work three or more times per month and would constantly be off-task due to her pain. *Id.*

c.    Other Opinion Evidence

On October 22, 2010, state agency physician and medical consultant, Dr. Dale van Slooten, reviewed the record and offered his opinion on Plaintiff's condition. Tr. 329-36. Dr. van Slooten noted Plaintiff's recent partial renal infarction, but opined it was not a severe impairment because her renal function was normal. Tr. 330. Dr. van Slooten also noted Plaintiff's history of "lupus with chronic pain and polyarthralgias," but noted this was controlled with medication and that Plaintiff had "no synovitis on recent exam," and had normal range of motion in her joints. *Id.* Dr. van Slooten concluded that Plaintiff's other impairments of acid reflux (GERD), high blood pressure (HTN), and anemia were not severe as they were treatable and/or stable. *Id.* Dr. van Slooten opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; could stand/walk six hours in eight-hour workday and sit six hours in eight-hour workday; had

---

in a dependent area, as of a limb, characterized by swelling or pitting."
http://www.medilexicon.com/medicaldictionary.php?t=27927 (last visited Jan. 27, 2014).

unlimited ability to push/pull; could frequently climb ramp/stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladder/rope/scaffolds; and had no manipulative, visual, communicative, or environmental limitations, except that she should avoid concentrated exposure to hazards. Tr. 330-33. Dr. van Slooten briefly noted he found Plaintiff's complaints about pain and other symptoms to be "partially credible," but the severity was "not supported by evidence." *Id.* Dr. van Slooten indicated he considered Plaintiff's complaints of chronic pain and fatigue by limiting her to light work. *Id.* As this opinion pre-dated the opinions of Plaintiff's treating physicians, Dr. van Slooten accurately noted the records he reviewed contained no statement from a treating source regarding Plaintiff's RFC. Tr. 335.

On December 21, 2010, medical consultant Luis M. Zuniga, M.D., reviewed a follow-up note dated November 10, 2010 (without identifying the provider) and found the additional evidence did not change the RFC provided by Dr. van Slooten, with which Dr. Zuniga concurred. Tr. 366. On December 22, 2010, medical consultant Ali Akbar Sadri, M.D. reviewed an August 19, 2010 follow-up note from Dr. Lawson [*see* Tr. 296-97], noted Dr. Lawson had not reported "significant abnormal findings," and concurred with the RFC provided by Dr. van Slooten. Tr. 367.

### d.     ALJ's Consideration of Opinion Evidence

SSR 96-2p provides that if a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]"  *See also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion

should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).

The Social Security Administration typically accords greater weight to the opinion of a claimant's treating medical sources, because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list:  (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d at 654; 20 C.F.R. § 404.1527. Treating source medical opinions are entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. As explained in SSR 96-2p,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96–2p. The Ruling also requires that an ALJ's decision "contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case

record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

In reviewing the ALJ's consideration of the opinions of Plaintiff's treating rheumatologist and family practitioner, the court is focused on whether the ALJ's decision is supported by substantial evidence. The court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

After correctly citing the applicable standards, the ALJ considered the opinion testimony as well as Plaintiff's testimony regarding her symptoms. Tr. 17-18. The ALJ discussed the opinions of Dr. Agha and Dr. Norris as follows:

> As for the opinion evidence, Drs. Agha and Norris completed checklist-style questionnaires, in which they described a very narrow range of sedentary work for which [Plaintiff] was purportedly suited, including opinions that she could sit, stand, and walk for no more than two hours per day. (Exhibits 10F and 11F [available at Tr. 355-57 and 358-65]). The undersigned has given little weight to these conclusory assessments, which were inconsistent with the objective medical record.

Tr. 17. The ALJ then cited to opinions of non-examining State agency physicians who "opined that [Plaintiff] was capable of performing a limited range of light work, avoiding concentrated exposure to hazards and climbing of ropes, ladders, or scaffolds (Exhibits 7F, 12F, and 13F) [available at Tr. 329-36, 366-67]." Tr. 17. The ALJ found those assessments to be "more consistent with the objective evidence," and gave them "great weight." Tr. 17-18. The ALJ also indicated she had "viewed the testimony in the light most favorable" to Plaintiff and "included restrictions with regard to extremes of temperature or humidity or exposure to sunlight." Tr. 18.

The undersigned is of the opinion that the ALJ did not adequately consider the opinions of Plaintiff's treating physicians. Importantly, the ALJ did not detail her conclusion that the

19

opinions of treating providers Drs. Agha and Norris were "inconsistent with the objective medical record." Tr. 17. Elsewhere in the decision, the ALJ notes that Plaintiff saw Dr. Agha every other month for treatment of lupus after her July 2010 hospitalization. Tr. 15. However, the decision then generally characterizes the treatment of Dr. Agha, finding that Dr. Agha's records indicated Plaintiff "had pain, primarily in the form of morning stiffness and fatigue." Tr. 15-16 (citing generally to exs. 6F, available at Tr. 328; 16F, available at 382-87; 19F, available at 407-10; and 24F, available at 435-36).

Regarding Plaintiff's treatment by Dr. Norris, the ALJ noted earlier in the decision that progress notes indicated Plaintiff's blood pressure was controlled by medication, she was on Coumadin therapy, and that, "[d]espite complaints of fatigue, [Plaintiff] appeared to be in no acute distress, and no significant deficits of functioning were noted." Tr. 16 (citing generally to exs. 5F, available at 299-327; 9F, available at 347-54; 17F, available at 389-402; and 23F, available at 421-33).

Although the Commissioner may give less-than-controlling weight to the opinion of a treating physician, such a determination must be adequately explained so that the court, on review, can determine whether the decision is supported by substantial evidence. Here, the ALJ has not done so. Rather, she generally states that the opinions were "conclusory" and "inconsistent with the objective medical record." Tr. 17. The general discussion of Plaintiff's treatment by Dr. Agha and Dr. Norris set forth elsewhere in the decision, does no more than generally characterize the findings of those providers without pointing to specific evidence. Tr. 16-17. The ALJ did not satisfy her obligation of considering and weighing the nature and extent of the treating relationships between Plaintiff and Drs. Agha and Norris. Nor did she discuss Dr. Agha's particular expertise in considering and evaluating lupus. The record shows Plaintiff

20

visited her treating providers regularly. For example, while the ALJ does acknowledge that Plaintiff saw Dr. Agha "every other month," Tr. 15, nowhere does she focus on that treating relationship and explain why, despite the relationship and Dr. Agha's expertise, she gave "little" weight to his opinion. The court acknowledges that Dr. Agha's records of Plaintiff's bi-monthly visits do not include detailed discussions of Plaintiff's symptoms or their potential impact on Plaintiff's RFC. Nonetheless, the records do indicate regular visits and Dr. Agha's continual monitoring of her condition, including his consideration of and dosing for treating Plaintiff's lupus with Plaquenil.[8] *See, e.g.*, Tr. 387 (Plaintiff's Aug. 11, 2010 visit to Dr. Agha in follow-up from hospital examination, including some illegible notes, starting Plaintiff on Plaquenil ["Plaq"]; Tr. 409 (Plaintiff's March 4, 2011 visit to Dr. Agha, noting Plaintiff was "tired achy," noting on musculoskeletal examination Plaintiff had "nodules, synovitis, OA-like, and Muscles tender," and increasing dosage of a medication and noting dosage of Plaquenil).

The undersigned finds that the ALJ did not adequately consider and weigh the various factors set forth in 20 C.F.R. § 404.1527. The ALJ's decision is insufficient in this regard.

Further, the ALJ does not explain in any detail her determination to give "great weight" to the non-examining state agency consultants, other than to generally cite to those opinions themselves and find they were "more consistent with the objective evidence[.]" Tr. 17 (citing exs. 7F, available at Tr. 329-36; 12F, available at 366; and 13F, available at 367). Although the Commissioner may rely on opinions of non-examining consultants who provide opinions after

---

[8] Plaquenil is a brand-name for hydroxychloroquine, a medication that is sometimes used "to treat certain auto-immune diseases (lupus, rheumatoid arthritis) when other medications have not worked or cannot be used." Plaquenil belongs to a class of medications known as disease-modifying antirheumatic drugs (DMARDs). It can reduce skin problems in lupus and prevent swelling and pain in arthritis. *See* http://www.webmd.com/drugs/drug-6986-Plaquenil+Oral.aspx?drugid =6986& (last visited Jan. 30, 2014).

reviewing records, such a decision must be explained in detail. *See Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986) (noting determination relying on opinion of non-examining, non-treating physician can stand only if medical testimony of examining/treating physicians go both ways). Here, the ALJ failed to properly explain her reasoning for assigning weight between the physicians as she did and failed to point to specific evidence contradicting the treating physicians' opinions. Accordingly, the ALJ's assignment of weight is inconsistent with the requirements articulated in the Social Security regulations.

Additionally, Plaintiff complains that the ALJ improperly discredited the opinions of Dr. Agha and Dr. Norris because they were rendered using "checklist-style questionnaires." *See* Tr. 17. The undersigned notes that, while courts have noted use of such a form may be considered to diminish the force of a treating source's opinion, use of such a form alone will not constitute persuasive contrary evidence for the ALJ to reject such an opinion. *See Jones v. Colvin,* 0:12-1773-MGL, 2013 WL 4823174 (D.S.C. Sept. 9, 2013) (remanding for further consideration of opinion of treating source, in part, because ALJ discounted opinion as being contained on "check-box form").

The undersigned recommends remand to the ALJ for further consideration. On remand, the ALJ should be required to specifically discuss the factors of 20 C.F.R. § 404.1527 in determining the weight to give the treating sources. Without this analysis, the court cannot determine that the ALJ's discounting of the treating sources' opinions and the reliance on the opinions of consultants who merely reviewed medical records is supported by substantial evidence. Further, the Commissioner should consider whether obtaining additional information from Plaintiff's treating sources would aid in the considerations on remand. *See* 20 C.F.R. § 404.1512(e)(1) (noting that, to the extent the information from a treating source is "inadequate

22

for [the Commissioner] to determine whether you are disabled . . . [the Commissioner] will first recontact your treating physician . . . to determine whether the additional information we need is readily available.").[9]

2. Remaining Allegations

Plaintiff also claims the ALJ erred in several other ways—including error in not finding Plaintiff satisfied the Listing criteria of Listing 14.02 (Lupus), by "mischaracterizing and misstating the record," and by failing to adequately explain the credibility findings. Pl. Br. 9-16. Based on the recommendation to remand and further consider the records and opinions of Plaintiff's treating sources, the court does not separately address these allegations of error at this time. However, on remand, the Commissioner is instructed to further consider Plaintiff's additional arguments regarding whether Plaintiff met or medically equaled a Listed impairment or combination of impairments and to more fully explain any required findings regarding Plaintiff's credibility[10] on remand.[11] *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.

---

[9] The court notes that this regulation was modified on February 23, 2012, and the requirement that the adjudicator contact the treating physician was removed. 77 Fed. Reg. 10651 (Feb. 23, 2012). This modification occurred after Plaintiff's claim was filed and the administrative hearing was conducted in this matter, making this regulation binding in this case. Further, the comments by the Commissioner in discussing the removal of that portion of the regulation made clear the Commissioner still "expect[s] that our adjudicators would continue to recontact your medical source when we believe such recontact is the most effective and efficient way to resolve an inconsistency or insufficiency." How We Collect and Consider Evidence of Disability, 76 Fed. Reg. 20282 (proposed Apr. 12, 2011) (to be codified at 20 C.F.R. pts. 404 and 416). *See Morgan v. Colvin*, C/A No. 9:12-562-RMG, 2013 WL 1786408, at *5 & n.1 (D.S.C. Apr. 25, 2013) (recognizing this change in the regulation and noting it was unclear in that case to the court "how the ALJ could resolve any ambiguity" about opinion of treating source without addressing physician directly).

[10] The undersigned notes the ALJ's current evaluation of Plaintiff's credibility in considering Plaintiff's RFC falls short of the analysis required by the regulations. *See* Tr. 17 (noting only that Plaintiff complained of "chronic achy joints and fatigue," but "objective details indicated that she had full range of motion and normal strength"). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and

23

2003) (remanding on a particular ground and declining to address claimant's additional arguments).

III.     Conclusion and Recommendation

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action as discussed within.

IT IS SO RECOMMENDED.

January 31, 2014                                     Kaymani D. West
Florence, South Carolina                            United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

---

must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5.

[11] The undersigned finds Plaintiff's allegation of error that the ALJ erred by "mischaracterizing and misstating the record" to be more a general restatement of her other allegations of error than its own allegation of error. On remand, the Commissioner's further consideration of Plaintiff's credibility will also address Plaintiff's claims raised on pages 13 through 14 of her brief.